Good morning, ladies and gentlemen. The first case on today's docket is the case of people ex rel. Patrick v. Harley-Davidson et al. And we have Mr. Anderson for the appellant and Mr. Daley for the appellee. Mr. Anderson, you may proceed. Thank you, Your Honor. Good morning, justices. Good morning. My name is John C. Anderson, and I represent the claimant, Peter Henderson, the owner of a 2010 Harley-Davidson trike motorcycle that she purchased new for $35,000. She's the sole owner of that motorcycle. Her husband is not a co-owner. The claimant was arrested April 26, 2014, was on the back of that tricycle motorcycle as a passenger being driven by her husband, who was a neighbor agent. They left the corner of Tavern, up 10 blocks, up North Cross Street, over 2, to their house. She was issued a ticket by the arresting patrolman of the Robinson Police Department at the county jail for allowing a person under the influence of alcohol to drive. We filed a motion to dismiss that ticket, as this was improperly issued and did not apply to her as the owner. Before that motion was heard, the state concurred in the motion requesting the trial court to dismiss that citation, which the trial court did. Peter started this motorcycle as a residence that evening, was marked as a passenger, drove to a tavern in Uplong, Illinois, where they ate, drove to another tavern in Larksville, Illinois, drove to another tavern in Palestine, Illinois, and then back to the Robinson, Illinois, to the Corner Place Tavern. Mark was having a great time drinking the entire evening. Petra was the driver of the motorcycle, and she was not drinking whatsoever. Mark became inebriated. He blew a .16 following his arrest for aggravated DUI, and when they left the Corner Place Tavern shortly before midnight in Robinson, Illinois, he fired up the motorcycle, jumped on it, ran in front of her, and said, told her, either get on or walk home. She told him he could not drive, he was inebriated, he was drunk, he didn't have a driver's license. In fact, he hadn't had a driver's license since 2008. Get off. She was not physically strong enough to get her husband off of that motorcycle. He was 5'7", 185 pounds, stocky little bully. Mr. Anderson, I'm unfamiliar with this motorcycle. I understand it held two people. Was it Big Harley? Yes, ma'am. It's a tricycle, that's what we would call it. Oh, it's a tricycle. It's got three wheels. Okay. Two front wheels steering and two back wheels and a long seat. So it's your position that it's not like she could have taken over control of this? Once he got on, she couldn't get him off. But she didn't have to get on herself. Pardon? She did not have to get on herself. No. She could either walk home in the middle of the night, black, right before 1 o'clock, and there's not very many people, let alone women, walking around Robinson in the middle of the night. And then, of course, the state said, well, she could have called a cab. There's no taxi cabs in Robinson, Illinois. No Uber? Or she could have gone back in the tavern. Well, they were closing. That's why they left. Were they closing? Their closing time was 1 o'clock? Yes. Okay. Is that in the record? Pardon? Is that in the record? What their closing time is, is that in the record? I don't think that was in the record, but all taverns in Robinson closed at 12 and they got to move them out by 1 just to see where the boys' dads went. There was some suggestion in the brief that was confusing to me about whether he avoided, quote, unquote, arrest versus ending up right in his driveway. That seems inconsistent to me to be avoiding arrest and then ending up in your driveway 12 blocks away. Could you clarify that for me? Well, I couldn't quite understand everything you asked. Did he obstruct the police in that he attempted to avoid arrest or did he really just follow a path back to his driveway? He just followed a path back to his driveway. The corner place tavern is located on Cross Street. When you come out of that tavern, he headed north up Cross Street, 10 blocks, and there were over two houses. When he got in front of his house, that's where he shut it down. And the police had their red lights on. Why didn't he stop earlier? He was bound and determined he was going to go home. Okay. Yep, they had the red lights on and they had the siren on also. But like I said, when he was taken into the county jail, they blew a .161, more than double the limit. He was arrested for aggravated DUI. And where exactly was the policeman located when he heard the defendant rev his engines? Right outside in front of the tavern. I mean like waiting in the parking lot? Yeah, a little parking lot across the street, yes. So they know it's going to close around 1 and they? They like to do that in Robinson. Yes, they do. Yes, ma'am. But anyway, she has a D and an M classification on her driver's license. He had no driver's license, hadn't since 2008. The trial court granted the state's forfeiture petition of Peter's motorcycle to the Robinson City Police Department, stating that the entire issue was whether Peter gave consent to Mark to operate that motorcycle. And the court went ahead and said, actions speak louder than words. So by her getting on the back as a passenger on that trike motorcycle, the court said that was consent. However, if she had got on the back of that Harley trike motorcycle on interstate, 50 miles away, that act would not have been consent. So the act's the same, but he's saying, well, it's different locations, whether it's consent or not. But that's not what he ruled in his docket entry. How critical do you think that is to the state's position when there wasn't any question that she was a bona fide owner and that she had actual knowledge of him committing an offense that fell under the statute? That's what the state's led to. Well, she had knowledge because she got on and he was driving. Do you disagree that she had knowledge that he was driving? No, she would have had the knowledge. Right. But she had no option except either to walk home by her lonesome self in the black night. Where in the statute does it show that she had the consent? Well, it says with knowledge and consent of the owner. So consent is part of the issue under that forfeiture statute to begin with. In our contention, what if she just by climbing on didn't equate to consent? The trial court further found that the claimant's and her husband's testimony was not credible and self-serving as the state had argued. But Katelyn v. GMAC Corporation stated that most testimony of a party is usually self-serving, so that characterization does not assist the state. Well, the standard of review is manifest way to the evidence, isn't it? Manifest way to the evidence is the standard of review on these facts, and the trial court determines credibility of witnesses, and part of this was the trial court simply did not believe her. Is that right? That's right. The court says that your testimony was not credible, and it was also self-serving, and that's what the state had urged in its closing argument. But what was there not to believe? Pardon? When the court said he did not believe her, what was there not to believe, that she couldn't have walked home? I mean, what was it that? He just found that their testimony was incredible. Why? I don't know. If we had 100 witnesses to put on, we would. No, but I'm trying to figure out what it was that the trial court said was not credible. Just said their testimony was incredible. Why? Their testimony or just hers? She said theirs, both the hers and the claim. Well, counsel, one thing was, I mean, Baybaugh testified that he had the key. Yes. And, I mean, the claim was that she'd been driving all evening. Yes. But he had the key for some reason. He had the key fob. Yes. So the trial court, you know, questioned whether it was true that he had not been driving earlier. The trial court never made that statement. It was never on the record. I think the appellate prosecutor brings that up in their brief, but it was never, ever mentioned by the trial judge. Okay. As far as we know, he never considered it. Was there any testimony on that? The testimony was that the husband had the key fob in his pocket, but the key fob, just like on a car, if you're close with whoever's got the key fob, push the button in the car and it'll start. But the unrebutted testimony was that she had been driving. The state didn't offer any contradictory testimony. He so testified and she so testified. He said, I was drinking, I was having a good time, I wasn't driving, and I intended to get plastered. But no other tavern owners were called to rebut that, or the state didn't put on anything else to rebut that? Nothing. Zero. Absolutely zero. And the only thing the state ever put on was, of course, what the police officer testified to. She was on the back of the truck. But my understanding, or maybe my take on how the court decided the case, was that consent was implicit once she decided to be a participant in the crime, essentially. She had the knowledge and she involved herself in the commission of the DUI. I believe that's what the trial court based it on. And that she was not forced to be a part of the commission of the crime. Right. A willful commission on her part. She didn't have a gun in her head, jump on the back or whatever. She had had a choice to walk home. Or call the police. Call a friend. Who calls the police on their husband unless it's a crime of violence? That's a real tough one. No question about it. No question about it. Unless it's a crime of violence. She didn't say whether she had a cell phone. We never testified to that. They never asked. The police officer never questioned whether she had or searched her or anything like that at the county jail. Whether she even had a cell phone. But she knew he was impaired. Pardon? She knew, apparently, he was impaired when she got on the back of the motorcycle. She flat-told him that. That he was in the process of committing an offense that was a criminal offense. Right. But she could not, she was powerless to prevent it. She just flat couldn't prevent it. It was her $35,000 piece of property. She just absolutely couldn't keep him or get him off of it. I do have a question talking about that. What about, I was reading the Camaro case. And they talked about the lien holder coming in and preventing the forfeiture. Was there, from what I read, there had only been a small amount paid on this vehicle. So I take it there was a lien holder? There was what? A lien holder? The title was held by who? Harley-David. Okay. Was there any effort to have the lien holder come in and assert a right? Because that's what it talks about in the Camaro case. No, there wasn't. That the state could also release a vehicle to a lien holder or secured party whose right, title, or interest is of record. Because, presumably, she might have difficulty in paying off this vehicle, which she still is obligated to pay off. And they'd be left, perhaps, holding the bag if she filed bankruptcy. Well, she was still paying that motorcycle. She paid an additional $2,600 on that motorcycle from the time she was arrested until the judge issued his order that that motorcycle is now the property of Rockland Police Department. And then what happened? She quit paying on it. But the lien holders still have the right to go after her. They do, but they never had. They were notified of this proceeding, and we informed the state that, you know, you might want to make them a party defendant here, and they never were. They were notified, and I don't think Carly Davidson, because it was CO less than $10,000, I believe, but they just never did do anything about it. But anyway, that Camaro case you brought up is the law generally disfavors forfeiture, and a statute authorizing them must be construed strictly in a manner as favorable to the person whose property is seized as is consistent with fair principles of statutory interpretation. But the crux of the Camaro case and the way I believe it was reversed on the basis is that the father and the co-owner of the car had no knowledge that his son was committing a burglary when he was driving the vehicle. Right. That's true. But then it goes further to say probable cause for civil forfeiture is comparatively easy for the government to establish, and it may seek to forfeit property linked with criminal activity under the following three circumstances. One, the claimant has been convicted of the criminal act or acts underlying the forfeiture. That's not so in this case. Two, the claimant has never been charged with any crime. Well, charged and dismissed because the ticket was improperly issued and did not apply to her. So, therefore, the claimant has never been charged with any crime. And three, the claimant has been charged and acquitted of the act or acts underlying the forfeiture. That pronged in the ply easier. So, clearly, the focus of the Eighth Amendment analysis should be on the claimant's conduct, the gravity of which decreases in each of those three situations. The United States of America versus real property located at 6625 Azurillo Drive, Malibu, California, in that case. Furthermore, that case set out three factors that should be weighed in determining whether a forfeiture was excessive under the Eighth Amendment. With no one factor being dispositive, the Illinois Supreme Court has adopted those same three-pronged tests in People-X-Rail-Waller versus the 1989 Ford F-350 truck, stating that this three-pronged test will give significance to the Eighth Amendment excessive fines laws and will have an added benefit of checking the government's potential for abusive use in civil forfeiture. Under the three-pronged test, this penalty court must weigh the inherent gravity of the offense compared with the harshness of the penalty. The gravity of the offense concerns factors of whether the crime was violent, completed, or attempted, whether the conduct was intentional or negligent, and whether the claimant was convicted, acquitted, or never charged with a criminal offense. So you apply those three prongs, and the first prong, the harshness of the penalty compared with her conduct, which would cause a reversal of the trial court's finding, and that weighs in favor of the excessive fine being imposed. Two, the motorcycle wasn't an integral part of the crime, okay? Three, Mark Henderson drove the motorcycle from the Corner Place Tavern up North Cross Street ten blocks over two blocks in a very, very, very short period of time. In fact, I made the same drive with my pickup truck driving no more than 30 miles an hour, and it took a minute and 15 seconds. So that prong itself weighs in favor of an excessive fine being imposed, which should cause reversal of the trial court's ruling. Can you tell me when the officer initiated the stop, how quickly? You say it was only a minute, a little more than today. Well, you know, he writes his ticket, it said 0043. Well, what I'm saying is that apparently he may have been at the tavern area and spotted him when he started it up. I mean, did he pursue him immediately? Yes, he did. By that spot. That's what it was. When he sees him, he sees it at her moment, that alerts him. He pulls out of the parking lot, he sees him coming on Cross Street and swerving. Oh, he almost hit a telephone pole. He made that swerve, and I was shocked. Of course, it would have been enough time, and it sounds like he was driving plenty erratically. He could have killed somebody within that period of time. According to the officer's testimony, he made a swerve. And he was after him at that time. So the use was spatial. At the uttermost, it's one incident. And the time, a minute or two, very short. Thank you. You'll have the opportunity for revising. Thank you. Mr. Daley, I hope you're getting along okay. I am, Your Honor. I feel your pain. I know you do. I think you told me that last time I was in that position. I've had low head, upper back, and I told you, I have upper back, upper neck, and a lower back as well. So this is the first of my three good mornings, Your Honor, today. And it looks like you're going to keep me busy. I want to start, actually, with a couple of questions that Justice Cates asked with regards to the credibility determination. I think one thing that also needs to be pointed out when we talk about manifest way cases and credibility determinations is that the trial court sits in a position much different and much superior to the position that this court sits in. Credibility determinations aren't always something that you can look at on a sheet of paper and say, well, there doesn't appear to be any manifest reason to say that a particular piece of testimony is not credible. Of course, if repeatedly, Supreme Court on down repeatedly say that the trial court's in a better position to weigh the credibility of witnesses precisely because they can judge their demeanor, manner of testimony, things of that nature. So I think that's one factor that plays into, I think, the longstanding deference that reviewing courts have to certain courts' factual determinations in a hearing. But usually when you talk about credibility, you talk about, wait, there's somebody on the other side. And here we have nobody with unrebutted testimony that she was the only one driving. So woulda, coulda, shoulda is not something that we can speculate on. It's true. It's true enough, Your Honor, but again, I reiterate that oftentimes testimony, you can probably make that what you're saying applicable to almost any situation where we read a transcript, where the witness gets on the stand and states something. And we don't have any objective reason ourselves to say that that's right or wrong, which is why precisely we give that level of deference to the lower court to assess sort of nonverbal cues, if you will. Now, I don't know if that's what the judge here did. I'm only stating this as a matter of appellate principle and review. Now, I'll answer your question. Let me interrupt you, though. As far as I get what you're saying about the manifest weight, but when we determine about the application of the standard for determining excessiveness under the Eighth Amendment, that review is de novo. You would agree with that? I would agree with that. Okay. Just so we get our two bird. How critical is it to determine her credibility with respect to whether or not she was driving earlier? Well, at this point, I think it's hard to do that in a way, in the sense that the court's already made that determination below. How does it impact, though, the ultimate issue? I don't think that it really does, because I think that if we're going to look at this from the sense of unrebutted facts, what is unrebutted is clearly that she had treated the scenario as essentially a fait accompli, that he's going to get in this motorcycle and drive away. He had the key five in his pocket. He was going to go. Now, when we talk about consent, we need to, I think, maybe talk about revocation of consent as well. I'm going to get off track slightly here, so bear with me on this, but there is a body of law in criminal law which talks about revocation of consent in conspiracy-type cases, that if you withdraw from participation in a conspiracy, then that's actually an affirmative defense to the charge. And what that entails is essentially an over-act in which you have repudiated the act of the other parties. What the person could have done here, now, I live in Robinson. I didn't do this case. There's a lot of facts that have been tossed out here I don't know, and they're not in the record, so bear with me. I don't know what time the bar is closed, but I know what cabs are if there's Uber in Robinson. Probably not, but, you know, I mean, you know, I don't know these things and neither does this court, so I think this court needs to keep that in mind as well. But or the location of the parking lot where the officer is located and whether he's, you know, out DUI-ing outside the bar, which does happen. I know. I've seen him do it. But the point of the matter is that she could have undertaken something to revoke consent by essentially refusing to say, I am not going to be a participant in those, but she did not do that. In fact, she went along on a joyride with this guy. Maybe joyride is not the right word, but she went along for the ride. I want to point out one factor that hasn't been discussed yet, though, in that regard. There was testimony actually presented by, I believe it was either Petra or Mar, I don't remember, about the manner in which people get on this motorcycle, and it was testified that because of the way the seat is configured, it's almost always the case that the passenger gets on the motorcycle first and then the driver. Now, the testimony of the witnesses subsequent to that was that Mar got on the motorcycle first, and she said, okay, well, what am I going to do? And then she hopped on the back. I think it is certainly plausible for the circuit court to consider their own testimonies that occurred earlier where she talked about how people get on a motorcycle, to find that particular way of describing it to be rather implausible. Well, they didn't say it was impossible for the passenger to get on. It's not impossible. But as a matter of practice, that is how people typically, according to the participants themselves or the respondents themselves, that's how people get on this motorcycle. I don't think a court could ignore that particular aspect of the testimony in assessing whether it's credible when they say later on that she sort of had it. If it's true, she had to basically squeeze herself onto this motorcycle through an act of physical contortion in order to become a passenger on the motorcycle. You know, I don't know that that makes a whole heck of a lot of difference because we know she participated. Whether or not he convinced her that she wasn't going to get the keys before or after she got on, I don't know that that makes any difference. And maybe she thought she was somehow protecting him by going along and helping him steer or drive. I think that's probably true, Your Honor. I just want to make sure that the court's aware that in making these credibility determinations, it's not a record that's devoid of any factors apart from just looking at demeanor that would give a court some cause to doubt the veracity of their testimony. The statute says knowledge and assessment. It does, yes. And so you agree that both must be present. Correct. In paragraph A, Justice Chatelain looked a little puzzled with that, but it is there in the first paragraph that does knowledge and assessment. The claimant concedes knowledge. Concedes knowledge. It really just boils down to consent. It really just boils down to consent. And the unerbited testimony is that the husband said, get on or walk home. And she said, okay, I'll get on. Was there testimony she said anything? No. I'm not sure she said that, but she got on. I don't think she said, okay, or in any way verbally indicated any consent. She just got on. And from that act, the trial court said that's consent. Actions speak louder than words. Now, let's take another analogy from criminal law. I mean, we know in search cases, consent, there's a line of cases that say, you know, when you didn't really have an ability to make a voluntary decision, if the police override your authority to have consent or whatever, that that's not really consent. Okay. Why shouldn't we apply that kind of line of cases to what is perceived as her consent here? You will find in a lot of those cases that almost be uniformly the situation, that that sort of lack of ability to consent is often triggered by, number one, the exercise of a police authoritarian act, which super, super subsumes a person's ability to make a rational choice and oftentimes is accompanied by threats such as consent or we're just going to arrest you and your mom and everybody in the house and take you out of the jail. It's a markedly different factual situation. But we, I mean, of course we don't have police here, but we have the husband who's intoxicated. Who's intoxicated. You know, saying, I don't care what you say, I'm driving. And you've got two choices, either get on or come home. But, I mean. But she got on a motorcycle with an intoxicated person. And there's no ands or buts about that. And she made that conscious decision. And could have been charged but for the fact that she owned it. Correct. Let me move on to something the court said. The court said the entire issue in this case is whether Ms. Henderson gave consent. I believe that's true. That wasn't the entire issue in this case, was it? The entire issue was not consent. But then the court needed to do something else. The court needed to move on and weigh certain factors. And I don't see any indication in the record that the court ever did that. You're talking about the Eighth Amendment? Yeah, I'm talking about the Eighth Amendment. The court relied on, I think, the 1989 Ford truck case. Well, okay. Let me go ahead. No, is that the one the court relied on? Yeah. Was that raised in the trial court? Well, I mean, I think what we're going here is, I think, combining two really separate things. The court has to make evidentiary findings as it relates to what the statute lays out. Correct. In order to find the Eighth Amendment is a constitutional challenge, which acts as, essentially, a challenge to the legality, as applies to Petra, to the forfeiture in and of itself. So it's not something that the court has to make a finding on in order to justify the forfeiture. It is a separate, legal, constitutional challenge used in an attack on the court's subsequent determination of forfeiture. The court followed. Which is one of the reasons why it's here. Right. And I didn't understand a bit of that. All right. Okay. Okay. I mean, let's assume that the consent issue isn't even something that we're past that. Okay. Right. Now, we have an Eighth Amendment issue that's been raised. That's been raised. It's been raised, and there's no, you don't have any challenge to the fact that it's properly before us. I don't. Okay. So the court did need to make, in determining whether to take that motorcycle, it was bound to make certain constitutional findings. And we do have the Illinois Supreme Court, which has adopted the U.S. Supreme Court's determination that there are factors, including the spatial use. And as I read these history of cases, these really come out of drug cases. Yeah. Okay. I mean, do they, did you really use the drug and the truck and the commission of sale and all of that? But here we have such a short time. I mean, we have 12 blocks, and you have a $35,000 motorcycle, and we're supposed to look at punishment? Is this excessively punishing a person who owns a motorcycle? I mean, aren't these factors that this court is now going to have to look at? Yeah, absolutely. And I don't disagree with that, but I want to make a couple points here. Yes, please do. First of all, as you correctly indicated earlier in this argument, that the issue of the Eighth Amendment and whether there's an as-applied Eighth Amendment challenge is reviewed by this court de novo. And de novo, as I understand that standard of review, is without virtually any deference to the lower court's finding. So I don't think it's a lack. No deference, right? No deference. Right. So the point to be made is I think that half of what you're saying to me is the court is required to make these certain findings in order to reject the Eighth Amendment claim. But then the second half of your position is that, well, it's de novo, so we're not bound by anything that the circuit court determines in the first place. So there's sort of an inherent conflict, Justice Case, in, I think, your characterization. But apart from all that, because I'm sounding more critical than perhaps I want to be, the circuit court did below reference the 1-200-2000 GMC case in its decision, and that case strictly deals with the Eighth Amendment issue and relied upon that case in rejecting it. So I don't think it's accurate at all to say that the court didn't take these things in. Excuse me. But in that case, the truck was owned by the individual who committed the offense. Correct. It was not something that we have here. But it's a distinction without a difference to the extent that you look at the analysis. We know from the statutory layout that it can be, I mean, it doesn't have to be the actual driver, but it's someone who gives consent to analyze the operation. Yeah, but we get to the Eighth Amendment question after you've decided to. Right. In the Eighth Amendment analysis, then, when you go into that kind of balancing test, it makes that assessment, if you will, about the sort of relative harshness, if you will. And it does take, and it asks you some, obviously, some factual consideration. That was raised below about the distinction, specifically raised below about the distinction between the actual operator and their act and the person who allowed them to operate the vehicle. And the argument that we made, and that this court can review the note, obviously, is that in the sense of the broad spectrum of facts here, we have an individual who consented to the operation. Consent, as you said, Justice Cates, we're already past that. So when we get to this, we've already had the judicial determination and their consent and knowledge. So given that set of circumstances that the consent had been given, consent had been given to a recidivist, DUI, no license revoked, aggravated DUI in the past, and was just flabbergasted drunk, 0.161, I think was the application. Allowed that person to operate. The testimony wasn't just a weave. The officer testified that he veered and almost hit a light pole. And, you know, God knows what would happen if someone were standing there, maybe not at 1230 in the morning. I don't know. But that's just the fact of the matter, is that this is a highly impaired driver. So I think that in that sense, that when the court makes that balancing test, particularly in light of the legislative determination in these statutes, that this is amongst the worst type of driving offenses that exist in Illinois, that in making that balancing test, the lower court could, and I believe this court absolutely can, use de novo review to make a similar determination that there was no incident of violation. Did he have aggravated DUI before this offense, or it was a result of this offense? I believe it was before. That's what my notes say. Okay. Because I thought otherwise. If I'm wrong, I'm wrong. I mean, there certainly is a DUI. But I believe it was an aggravated DUI. I know he was convicted of that. If I'm wrong in this case, I apologize. It may just be a misstatement in my notes or whatever, but I believe that's what their testimony was. But whether it was aggravated DUI or DUI, it was certainly a DUI. So he's no doubt a recidivist in that sense. He's driving drunk again and doesn't have a license. And lost his license because of. And I guess if we're going to talk about things not on record, I probably should point out people typically don't have their licenses revoked after a first DUI. They don't. But they do after an aggravated DUI. So this is an analog driving while license is suspended situation. But anyway, that's not here or there. I don't want to get into that. I've already made a point to stick to the facts of this case. But I believe that when you look at both the facts as the court considered them, and the legal analysis that justifies rejection of the 8th Amendment plan, that the decisions of the lower court were justifiable and should be affirmed. Your Honor, do you have any other questions for me? Thank you, Mr. Daly. I appreciate your time. Do you have any rebuttals, sir? Thank you. May it please this honorable court, the appellee brought up the 2000 GMC case that the judge compared the $28,000 forfeiture of that truck to the $35,000 motorcycle in our case. But there's a huge difference in the 2000 GMC case in our case. The owner, Durer, was the driver of his truck. He was driving on a suspended license as a result of a prior DUI, and he pled guilty to that offense of driving on a suspended license. That court went ahead and held that taking his car off the road will do more to prevent him from driving than simply giving him a suspended license, which didn't keep him off the road. And therefore, this is remedial punishment to that owner driver. Well, here we have remedial punishment for what? My gal didn't commit any act to receive this gross punishment. Nothing. By simply just getting on the back of her motorcycle, which they testified to, usually, customarily, the passenger gets on first and then the driver, customarily. But that doesn't prevent the passenger from getting on one. So my thinking and my prayer to this court is simply, did Petra Henderson ever contemplate or ever think that her act of getting on that motorcycle shortly before 1 o'clock in the black of morning, pursuant to her husband's demand, get on or walk home, would constitute an act to create a forfeiture under the Eighth Amendment law? I don't think so. I think this punishment was pure punishment, nothing more, for her innocent behavior. For these reasons and the foregoing reasons of my argument, we ask that this appellate court reverse the trial court's forfeiture order and return the motorcycle to Petra Henderson. Furthermore, courts of equity, a court of forfeiture. Thank you. Thank you, Mr. Anderson, and thank you, Mr. Daly. We'll take the matter under advisement.